IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 13, 2011 Session

## STATE OF TENNESSEE v. ADRIAN LEROY SCOTT

**Appeal from the Criminal Court for Davidson County**
**No. 2006-B-1108      Monte Watkins, Judge**

---

**No. M2010-00625-CCA-R3-CD - Filed January 17, 2012**

---

Following an indictment charging three counts of sexual battery by an authority figure and two counts of rape, a Davidson County Criminal Court jury convicted the defendant, Adrian Leroy Scott, of three counts of assault, *see* T.C.A. § 39-13-101(a)(3) (2003); one count of attempted sexual battery by an authority figure, *see id*. §§ 39-13-527(a)(1)(B), 39-12-101; and one count of attempted sexual battery, *see id*. §§ 39-13-505(a)(1), 39-12-101.  The trial court imposed an effective sentence of three years' split confinement consisting of six months' incarceration in the workhouse followed by two and one-half years on probation. In addition to contesting the sufficiency of the evidence to support his convictions, the defendant argues on appeal that the trial court erred by denying (1) his motion to suppress his statement to the police, (2) his motion for a mistrial based upon the undisclosed testimony of a rebuttal witness, (3) his motion to dismiss counts three and five based upon a fatal variance between the indictment allegations and the proof presented at trial, and (4) his request to present evidence at trial concerning the sexual offender registry.  The defendant also contends that the trial court erred by imposing consecutive sentences and denying him full probation.  The State concedes that the trial court erroneously imposed consecutive sentences and also notes that the trial court failed to merge two sets of alternative counts. On remand, the trial court shall enter corrected judgments reflecting merger and concurrent sentences.  Discerning no other error, we affirm the judgments of the trial court as modified.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed as Modified**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Jeffery L. Frensley, Nashville, Tennessee, for the appellant, Adrian Leroy Scott.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and J.W. Hupp, Assistant District

Attorney General, for the appellee, State of Tennessee.

**OPINION**

In October 2005, the then-14-year-old victim, M.P.,[1] told her mother that the defendant, the victim's stepfather, had touched her inappropriately on several occasions. Their family, which included the victim's two younger brothers, got along "in the beginning," and the victim described her relationship with the defendant as a "typical father-daughter relationship." In the first home the family shared, nothing unusual occurred between the defendant and the victim except some wrestling during which the defendant touched "[the victim's] breasts or . . . butt." At the time, however, the victim believed the touching was accidental. Although the reported incidents had occurred over an approximately two-year time period after the victim turned 13, the victim was nervous to tell her mother and only did so at the urging of a close friend.

Because the family was in the process of building a home, they spent nights at either the defendant's mother's home or the victim's maternal grandmother's home intermittently for approximately six months. The victim recalled one specific incident that occurred after the victim had attended her first football game while she, the defendant, and her youngest brother stayed the night at the defendant's mother's home.[2] Her brother wanted to sleep in a trundle bed with the victim, but the defendant instructed his son to sleep in the nearby daybed, while the defendant and victim shared the trundle bed. The victim awoke that night to feel the defendant "[r]eaching his hands up [her] shorts." The victim, who was menstruating at the time, felt the defendant's finger touch her skin "around the area of her tampon string . . . . going into the inside" of her labia. The victim began "coughing and moving around." The defendant then "stopped" and "[s]lowly tried to remove his hand" from the victim's shorts. The victim got up to use the bathroom and then returned to the bed, where she tried to stay awake for the rest of the night. She believed the defendant was "[p]laying asleep" throughout the incident. She did not immediately report the incident to her mother; she explained, "I wasn't sure [that it happened] because you see this kind of stuff happening on movies, but you would never think that it would happen to you."

The victim was not allowed to use the computer without the defendant's permission, and the defendant required the victim to sit on his lap whenever she used his computer. On several instances, the defendant "tried to touch [the victim] . . . [i]n between

---

[1] It is the practice of this court to refer to child victims of sexual abuse by their initials.

[2] The victim's younger brother was the defendant's biological son. He was four or five years old at the time.

[her] legs." Once, when a friend of the victim was visiting, the defendant reached between the victim's legs into her shorts and attempted to move the victim's underwear over to gain skin-to-skin contact with the victim's genital area. The victim jumped up "instantly." She ultimately stopped using the defendant's computer. On cross-examination, when asked if the defendant could have been scratching, the victim testified, "No. I think he knew exactly what he was doing."

In their new home, the victim's bedroom was located in the basement near the defendant's home office. She also had an adjacent bathroom. She recalled that she "would get out of [her] shower and [the defendant] would actually be in [her] closet waiting for [her] to undress." Once, the defendant "actually came out [of the closet] and [tried] to start wrestling the towel off of [the victim]." The victim screamed for her brothers, who quickly ran downstairs, and the defendant said, "'You're no fun. Why [are] you being like that? It's nothing I [have] never seen before." To her knowledge, the defendant had never seen the victim naked. From that time on, the victim would check her closet and lock her doors before dressing or undressing.

The defendant often tucked the victim in at night because she was afraid of the dark. Later, he began coming into her room during the middle of the night. Once, the victim awoke to find the defendant lying on top of her with a comforter between them. She could not recall whether he touched her. The victim moved and the defendant left and returned to his bedroom upstairs. Although the defendant did not speak, he was not dazed or confused when leaving her room. The victim denied that the defendant often fell asleep in her room watching television. The victim believed that the defendant "was very awake every time he tried to touch [her]."

After learning of the victim's report, the victim's mother confronted the defendant. The defendant apologized and told the victim's mother that he wanted to get help. The victim's mother asked the defendant to leave their home, and the couple eventually divorced. The victim was hesitant to talk to authorities because she was concerned about the incidents being reported on the news. When a Department of Children's Services (DCS) investigator contacted her, the victim knew that "[s]omeone had apparently told someone."

The victim's mother, Konya Hollands, married the defendant in 1998, and the couple divorced in 2008. Ms. Hollands brought two children to the marriage, the victim and a son. Ms. Hollands and the defendant's son was born in 2000. Ms. Hollands described her initial relationship with the defendant as "heaven-sent." She expressed no concerns at first with the defendant's relationship with the victim. While living in their first home, however, Ms. Hollands became concerned over the defendant's wrestling and requiring the victim to sit on his lap at the computer because she "felt like little girls shouldn't sit on men's laps

[and] they shouldn't wrestle." Each time Ms. Hollands voiced her concerns to the defendant, he acted offended by her "insinuation."

The family lived with relatives for some time in 2004 while building their new home. During the same time period, Ms. Hollands graduated from nursing school and began working the 7:00 a.m. to 7:00 p.m. shift three days a week. The defendant, a firefighter with the Nashville Fire Department, worked 24 hour shifts and was off work for 48 hours on a rotating basis. The couple never left the children at home alone. As the victim approached her "teenage years," the victim and the defendant experienced "friction." Throughout 2004 and 2005, the "friction" between the defendant and the victim increased. When the family held "family meetings," the defendant and the victim engaged in "like a push and pull, a tug – a tug of war, almost like." As the friction between the victim and the defendant increased, the defendant gave the victim an expensive cellular telephone, one that Ms. Hollands said that she would not have purchased for herself. Retrospectively, Ms. Hollands believed that the expensive cellular telephone "was part of [the defendant's] grooming [the victim]."

In October 2005, while the defendant was away from home, the victim approached Ms. Hollands and was "kind of fidgety and nervous acting . . . like she wanted to say something but she didn't want to say something." When the victim disclosed to her mother what had happened with the defendant, Ms. Hollands was "shocked." She said the report "was like a brick hitting [her] in the back of the head." When Ms. Hollands confronted the defendant outside the victim's presence, he did not admit explicitly to any behavior, but he told Ms. Hollands that she "had to believe [her] daughter." She asked the defendant to leave the home, and he went to live with his mother across the street. Several days later, during a meeting among the defendant, Ms. Hollands, and the victim, the defendant apologized and told his wife and the victim "that he was sick [and] that he needed help."

The victim initially only reported the incident that had occurred at the defendant's mother's home. After the defendant left the family home, the victim eventually disclosed more inappropriate behavior by the defendant. Ms. Hollands reacted to the information by suffering "a very deep depression." She did not contact the police herself because she was "in love . . . [and] blind." She explained also that the victim asked her not to do anything after the defendant promised it would not happen again. Ms. Hollands also believed, based upon other conversations with the defendant, that "it was a fireman-policeman type thing where they would take [the defendant] off, cool him down, and then everything would be okay." The defendant continued to promise Ms. Hollands that "everything [would] be fine" and that he "would have his family back." After Ms. Hollands began counseling, she realized that she "needed to cut [her] ties" to the defendant. Ms. Hollands filed for divorce and spoke to investigators in February 2006. The victim gave a

statement to DCS investigators around that same time.

After the police investigation began but before Ms. Hollands filed for divorce, the defendant told Ms. Hollands that parasomnia caused him to commit the acts and recommended she look up the disorder on the internet. Ms. Hollands instead contacted the District Attorney General's victim-witness coordinator to inform her of the defendant's explanation. Ms. Hollands testified that she never saw any evidence of "odd sleep behavior" in the defendant. She also thought the victim's report of waking up to find the defendant on top of her in her bed bore similarity to something the defendant would sometimes do to her. Ms. Hollands said that the defendant would take the kids to school and return home where she would be sleeping, having worked the night shift the previous night. The defendant would "put baby oil on himself . . . and he'd slide in bed beside [her], and he would just kind of grind on [her]." At the time, Ms. Hollands thought it was "like a game," so she would pretend to be asleep even if she was not. The defendant would ejaculate "in a rag." Once, she asked the defendant why he would "sneak" like that, and he told her that he did not want to wake her. Ms. Hollands said that the defendant did not try to fondle her when this behavior would occur and that she was certain he was always awake.

Forrest Garrett, a court officer with the Davidson County Circuit Court and also a Wilson County Sheriff's Deputy, knew the defendant as his "brother-in-law's grandson." The defendant contacted Officer Garrett after the defendant's confrontation with Ms. Hollands concerning the victim's allegations. The defendant asked Officer Garrett for advice and help dealing with his "inappropriate touching" of the victim. During their discussion, the defendant never mentioned being asleep when the touching occurred. Officer Garrett told the defendant that he could put the defendant in touch with someone at the Metropolitan-Nashville Police Department (Metro) who could "assist" the defendant. Ten minutes after their conversation, the defendant telephoned Officer Garrett and told him "not to worry about" what they had discussed because the defendant and his wife had decided to deal with the problem within the family. Officer Garrett told the defendant that it was "too late" because Officer Garrett had a duty to report the allegation. He also warned the defendant that Ms. Hollands could "get in trouble" if she failed to report the allegation. Officer Garrett telephoned Metro Detective Greg Robinson the next day.

Greg Robinson, an investigator with the Vanderbilt University Police Department at the time of trial, investigated the incidents as an assistant detective with Metro. Mr. Garrett contacted Detective Robinson with information concerning a sexual abuse disclosure made to Mr. Garrett by the defendant. Detective Robinson arranged a "controlled telephone call" between Mr. Garrett and the defendant during which the defendant made admissions that substantiated Mr. Garrett's report. The defendant then agreed to meet with Detective Robinson and Detective Keven Cooley later that day at the fire

station where the defendant worked.

At their meeting, both detectives informed the defendant that he was not under arrest and was free to leave at any time. The detectives did not, however, inform the defendant that the conversation was being recorded. The defendant agreed to an interview, but he refused to sign a written statement. The defendant sat in the front seat of Detective Cooley's unmarked car, with Detective Cooley seated in the driver's seat and Detective Robinson seated in the backseat, while the three men discussed the victim's allegations.

The defendant admitted details of the victim's allegation that had occurred at his mother's house. Although the defendant did not indicate that he was taking sleep medication, he did tell the detectives that he was asleep or "in a daze" when the incident occurred. The defendant discussed five separate incidents of touching the victim, including the single incident of digital penetration that occurred at his mother's house. The defendant told the detectives that he told his wife that he needed to turn himself in. The defendant never attempted to stop the interview. Detective Robinson did not advise the defendant of his *Miranda* rights because the interview occurred in a non-custodial setting.

Detective Keven Cooley participated in the interview of the defendant at the fire station. The defendant admitted touching the victim inappropriately at the family's first home, his mother's home, and the second home. The defendant openly admitted his transgressions and apologized. He did, however, claim that all the incidents occurred when he was asleep. Detective Cooley recalled that "[a]ll the fondling occurred at night, after [the defendant] either tucked [the victim] in or fell asleep with her." Although his discussions with the defendant about the defendant's wrestling with the victim did not seem sexual, Detective Cooley also opined, "when you put the entire story together, I think you have something else at that point." The defendant did not report having any sleep issues, but he told the detectives that he would sometimes yell or fondle his wife in his sleep. Detective Cooley testified that he and Detective Robinson did not arrest the defendant after the interview because Metro uses "the grand jury method" of arresting via an indictment or information to shield the victim from testifying multiple times in court.

With this evidence, the State rested its case. At the close of the State's proof, the State elected the following facts in support of each count of the indictment:

> **Count One** (charging sexual battery by an authority figure): the victim awoke to find the defendant lying on top of her with a comforter in between them and the defendant admitted touching the victim inappropriately

**Count Two** (charging sexual battery by an authority figure): at the defendant's mother's home, the victim awoke to find the defendant reaching inside her shorts with his finger touching her labia

**Count Three** (charging sexual battery by an authority figure): while sitting on the defendant's lap at the computer, the defendant touched the victim's clothing in an effort to push her underwear aside

**Count Four** (charging non-consensual rape): the incident at the defendant's mother's home, as an alternative to count two

**Count Five** (charging forcible rape): the computer incident, as an alternative to count three

The defendant then orally moved for judgments of acquittal on all five counts. The trial court denied the defendant's motion with respect to counts one through four. The court partially granted the defendant's motion with respect to count five and ruled that the evidence established only an attempted sexual battery.

Doctor James Brevard Haynes testified for the defendant as an expert in sleep medicine. Doctor Haynes treated the defendant, whom he diagnosed with parasomnia. Doctor Haynes explained that parasomnia encompasses any "undesirable physical event, or experience, that occurs during sleep." He further explained that examples of parasomnia include night terrors, sleepwalking, sleep-talking, and sleep-eating. Significant to the defendant's diagnosis, parasomnia may also include sexual activity that occurs during sleep, ranging from masturbation to intercourse. Doctor Haynes stated that sexual parasomnia often goes undiagnosed unless it involves an unwilling "recipient," such as a minor or someone other than a spouse. Most people who suffer from sexual parasomnia also have a childhood history of sleepwalking. Sexual parasomnia is commonly diagnosed based upon anecdotal histories taken by the patient or a spouse and does not always manifest during a clinical sleep study because a spouse or partner would not be present. Doctor Haynes acknowledged that sleep parasomnia is not an accepted psychological disorder in the Diagnostic Statistical Manual IV; rather, he maintained that sleep parasomnia is a medical condition.

In July 2006, a sleep study conducted of the defendant revealed that the defendant experienced several episodes of wakefulness, but he did not exhibit any sexual behavior during the study. The defendant reported suffering night terrors and incidents of sleepwalking as a child. The defendant told Doctor Haynes that he had fondled Ms. Hollands

during his sleep when they were married. Likewise, the defendant's current wife reported that the defendant had fondled her in his sleep.[3] Doctor Haynes determined that the defendant had been "straightforward" with the investigation, that the alleged criminal acts were "out of character" for the defendant, and that "there [was] no history of any vaginal fondling of [the victim] during wakefulness." Based upon these considerations, Doctor Haynes opined that the defendant's acts against the victim were unintentional and caused by sexual parasomnia.

Doctor Haynes maintained that Ms. Hollands' testimony at trial, despite her testimony that the defendant was awake when he would "grind on" her, was consistent with the history provided by the defendant. He also maintained that the victim's testimony at trial was consistent with the defendant's report and that the victim may not have realized that the defendant was asleep when the inappropriate behavior occurred. As to the victim's allegation concerning sitting at the computer, Doctor Haynes said that the allegation did not change his diagnosis. He maintained that the defendant and the victim had "some boundary issues," as evidenced by the testimony concerning the defendant's hiding in a closet or grabbing the victim's towel, but he believed that the computer incident was "almost anatomically impossible" or that "a touch that started off as something innocent was interpreted in a wrong way" by the victim. Doctor Haynes believed that the defendant only admitted facts that were reported to him by the victim and Ms. Hollands and that any additional facts revealed in the defendant's statement to the police stemmed from the detectives' leading the defendant during the interview. Ultimately, Doctor Haynes admitted on cross-examination that he disregarded facts not in agreement with the defendant's self-report because he "ha[d] to believe [the defendant's] word" in order to maintain his diagnosis.

David Warman, an assistant chief with the Nashville Fire Department, first met the defendant in 1997 when the defendant was in training. Assistant Chief Warman stated that the defendant made a "good impression" during training and developed into a "great" fire fighter. He had no knowledge of any inappropriate behavior committed by the defendant involving coworkers or the public. Assistant Chief Warman found the victim's allegations "hard to believe" and "inconsistent" with his knowledge of the defendant's character.

Angel Scott married the defendant approximately one year before the June 2009 trial. She described their marriage as "loving" and the defendant as "a kind, caring person." Ms. Scott knew about the victim's allegations before marrying the defendant, but she testified that she did not believe the claims. Ms. Scott reported that the defendant often

---

[3] At the June 2009 trial, the defendant and his current wife had been married approximately one year. The report of his current wife was an addendum to Doctor Haynes' July 2006 report.

talked, twitched, rubbed, or grunted in his sleep. On several occasions, she awoke to discover food wrappers or crumbs in their bed. Once, when Ms. Scott thought the defendant was initiating sex during the night, she rolled over and realized that the defendant was asleep and "completely unresponsive" to her. When she told the defendant about what had happened the next morning, the defendant could not remember anything and became very upset. Ms. Scott discussed these behaviors with the defendant, who relayed them to his attorney and Doctor Haynes. Ms. Scott did not know that the defendant was being treated by Doctor Haynes until one week before trial, which was also when she first spoke to Doctor Haynes.

Alex Scott, the defendant's brother and also a Nashville fire fighter, recalled that the defendant, as a child, "would jump up and scream due to the 'Thriller' video of Michael Jackson . . . [because] it triggered different emotions in [the defendant] at night." He also recalled the defendant's seeing "angels and things of that sort." As teenagers, Mr. Scott would enter the defendant's bedroom, ask to borrow clothes, and leave the defendant's room with approval to borrow clothing only to find the defendant angry with him later in the day with no memory of permitting him to borrow the clothing. On one occasion, Mr. Scott watched the defendant walk from his bedroom, "pass out" in the hallway, and awake confused with no memory of leaving his bedroom. Mr. Scott also caught the defendant urinating into a clothing hamper once. During all of these incidents, the defendant "wasn't aware of anything that was taking place."

When the victim's allegations came to light and the defendant first left home, he lived with Mr. Scott for a brief period of time. Mr. Scott's daughter was two-years-old at the time, so the defendant was not able to stay there throughout the initial separation. Mr. Scott recalled that Ms. Hollands initially wanted the family to stay together. After the allegations appeared in the news, however, any chance of reconciliation disappeared. By January 2006, Mr. Scott knew the couple would be divorced.

The defendant testified that his career as a fire fighter exposed him to many traumatic situations. He claimed he had difficulty sleeping, especially when at the fire station. He said that he suffered nightmares and talking in his sleep as a child, but doctors told him that he "would grow out of it." He found his sleep issues "shocking because it's like you're not even in control."

At the time of the allegations, the defendant claimed that he bore a lot of responsibilities at home because Ms. Hollands was "one of those career-type women that want[ed] to work all the time. And when they want to work all the time they don't ever want to be home." When Ms. Hollands confronted him with the victim's allegations, he was "shocked [and] upset." He described the allegations as "confusing" because he could not

remember anything. The couple decided that it was "a good idea" for the defendant to leave their home.

Although Ms. Hollands did not want the defendant to tell anyone about the allegations, the defendant contacted Officer Garrett because he thought Officer Garrett would know someone who could help. The defendant also expressed concern for the victim. The defendant testified that, after disclosing the allegations, Officer Garrett assured the defendant that no one would have to go to court and that the entire incident "wouldn't be nothing." The next day, Officer Garrett contacted the defendant to arrange a meeting with Officer Garrett's "good friends." The defendant claimed that Officer Garrett did not tell him that the "friends" were actually Metro Detectives Robinson and Cooley.

The defendant spoke with Officer Garrett's "friends" in the parking lot of the fire station. When asked if the men identified themselves as police officers, the defendant said, "They may have. I don't know." The defendant testified that he only told the men what Ms. Hollands had told him happened. He denied any personal recollection of the incident that the victim alleged to have occurred at his mother's home. He, likewise, claimed that the allegations concerning the computer and lying on top of the victim were new incidents never before reported until the time of trial.

The defendant testified that his primary care physician referred him to Doctor Haynes for treatment of his sleep problems. He denied that his seeking treatment from Doctor Haynes had anything to do with creating a defense to the charges. The defendant said that he, in fact, did not know that parasomnia was a sleep disorder until sometime in July 2006 when first diagnosed by Doctor Haynes.

The defendant denied committing any of the acts alleged by the victim. He denied hiding in the victim's closet or trying to pull off her towel. He denied knowing that Officer Garrett's friends were police officers. The defendant also denied telling a supervisor that he was touching the victim and claimed that the supervisor probably had him confused with his brother, Alex, who also had a daughter. In summary, the defendant adamantly denied touching the victim in a sexual manner at any time.

In rebuttal, the State presented the testimony of Manuel Fonseca, a District Chief with the Nashville Fire Department. Chief Fonseca testified that he became acquainted with the defendant when the defendant was a "traveler" fire fighter who worked temporarily in his station from January to September 2002, when the victim was 11 years old. Chief Fonseca recalled that no issues arose concerning the defendant's sleep habits or behavior while at work. One day, however, as Chief Fonseca routinely asked the group about their stress levels and their lives away from work, the defendant said, "I have sex with my

daughter." Chief Fonseca reported the statement to his supervisor who dismissed it as a joke. Chief Fonseca also documented the remark in his log book, but he said that the "documents [were] long gone" by the time of trial.

On cross-examination, Chief Fonseca testified that he saw the defendant regularly, did not know he had a brother who also worked for the department, and, therefore, had not confused the brothers. He said that the defendant's statement had always bothered him. When Chief Fonseca saw the news report of the defendant's arrest, he immediately telephoned the District Attorney General's Office to inform them of the defendant's statement.

Following the completion of Chief Fonseca's testimony, the defendant orally moved for a mistrial or limiting instruction concerning Chief Fonseca's testimony. The defendant based these alternative requests upon the State's failure to disclose the substance of the defendant's statement to Chief Fonseca, which the defendant characterized as "surprise evidence." The State argued that Chief Fonseca had been listed as a potential witness and that there was no requirement to disclose the nature of his testimony in advance of trial. *See* Tenn. R. Crim. P. 16(a)(2) (Rule 16 does not "authorize discovery of statements made by [S]tate witnesses."). The trial court denied the defendant's request for a mistrial and his alternative request to limit the evidence with a curative instruction.

The jury convicted the defendant of simple assault, a Class A misdemeanor, in counts one, two, and four. In counts three and five, the jury convicted the defendant of attempted sexual battery by an authority figure and attempted sexual battery, respectively. At the return of the verdicts, the court and parties noted that count two would merge with count four and that count three would merge with count five. At sentencing, however, the trial court entered separate judgments and sentences for each count, failing to merge these alternative counts. The court imposed sentences of six months for each assault conviction, two years for the attempted sexual battery by an authority figure conviction, and 11 months and 29 days for the attempted sexual battery conviction. The transcript reflects that the trial court ordered the sentences to be served consecutively to one another, for a total effective sentence of four and one-half years, with six months to serve in the workhouse followed by four years' probation. The judgments, however, reflect a total effective sentence of three years' split confinement consisting of six months' incarceration in the local workhouse followed by two and one-half years' probation.[4]

_____

[4] We discern that the discrepancies may be related to the trial court's attempt to merge the alternative counts. The imposition of concurrent sentences, however, does not accomplish a merger of convictions. We will address these discrepancies further in our discussion of the defendant's sentencing
(continued...)

On appeal, the defendant contends that the trial court erred by denying his motion to suppress his statement to Detectives Robinson and Cooley and by denying his motion for mistrial based upon Chief Fonseca's rebuttal testimony. He also contends that the evidence is insufficient to support his convictions and that a fatal variance between the indictment allegations and the proof at trial occurred with respect to counts three and five. The defendant argues that the trial court erroneously limited his examination of witnesses concerning their feelings about the defendant's placement on the sexual offender registry. As to sentencing, the defendant urges this court to reverse the trial court's imposition of consecutive sentences and denial of full probation. The State concedes that the trial court erroneously imposed consecutive sentences and failed to merge count two with count four and count three with count five in light of their alternative allegations. In all other respects, the State asks this court to affirm the defendant's convictions.

*Suppression of Statement*

The defendant filed a pretrial motion to suppress his statement made to Detectives Robinson and Cooley, alleging that the detectives' surreptitious recording of his statement made via his contacting Officer Garrett as a friend violated his rights. The State argues that the totality of the circumstances shows that the defendant's confession was voluntary and that the trial court's denial of the motion to suppress should be affirmed.

At the January 26, 2007 evidentiary hearing, Officer Garrett testified that he "got home one evening and [he] received a phone call from [the defendant] and [the defendant] wanted to talk to [him] about a problem . . . between [the defendant] and his step-daughter." When the defendant came to Officer Garrett's home, he admitted "inappropriate[ly] touching his step-daughter." After discussing the victim's allegations "for about a minute or so," Officer Garrett stopped the defendant and advised the defendant of his status as a court officer and reserve officer and told the defendant, "[w]hat you are telling me it cannot stop here." The defendant told Officer Garrett that he needed help. Officer Garrett and the defendant planned to meet the next day at the Davidson County Criminal Justice Building where Officer Garrett told the defendant he would take the defendant to someone for help.

The defendant then left Officer Garrett's home. Later that evening, the defendant telephoned Officer Garrett and told him that after talking to his wife, "they just decided not to do anything about [the allegations], just to forget it." Officer Garrett told the defendant that he could not do that, and Officer Garrett contacted Detective Robinson the

---

[4](...continued)
issues.

next day.

Officer Garrett telephoned the defendant to tell him that Detective Robinson wanted to meet with him. During his conversation with the defendant, Officer Garrett warned the defendant that counseling was not enough and that the defendant needed to talk to the police. The defendant then agreed to talk to Detective Robinson.

On cross-examination, Officer Garrett said that he had known the defendant for 10 or 12 years and that the defendant knew that he was a court officer. Officer Garrett did not discuss with the defendant his *Miranda* rights because the defendant contacted him and Officer Garrett did not interrogate the defendant at any time. Although the defendant initially told Officer Garrett to "forget" about their conversation, the defendant "would call [Officer Garrett] occasionally and want to know . . . what [the detectives] were going to do about [his case]." Officer Garrett admitted that he advised the defendant to "shoot straight" with Detective Robinson and that Detective Robinson "would take care of" the defendant.

Detective Robinson was working as an investigator with the Metro Sex Crimes Unit when Officer Garrett contacted him on October 27, 2005, concerning the defendant's report that the defendant inappropriately touched the victim. After substantiating Officer Garrett's report via a controlled telephone call between the defendant and Officer Garrett, Detectives Robinson and Cooley went to the fire station to interview the defendant. The detectives identified themselves as police officers and informed the defendant that he was not under arrest. During the recorded interview, the defendant made inculpatory admissions concerning five separate incidents of touching the victim. The defendant admitted that "he could have put his hand inside [the victim's] skin just a little bit inside her vagina." The defendant spoke freely with the detectives and did not request a lawyer or stop the interview at any time. The detectives extended no promises of leniency or help to the defendant, although they did stress the importance of the defendant's cooperation.

At the evidentiary hearing, the defendant conceded that the case presented no issue concerning advising him of his rights via *Miranda*, but he argued that his statement was involuntary due to the circumstances surrounding the interview that created "extreme undue influence" by the detectives. The State argued that the defendant voluntarily spoke with the detectives and that the detectives did not exert any influence during the interview. The trial court found that the defendant's statement did not result from any threats or inducements by the detectives and was, therefore, voluntary.

When reviewing a trial court's findings of fact and conclusions of law on a motion to suppress evidence, we are guided by the standard of review set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in

a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id.* at 23. When the trial court does not set forth its findings of fact upon the record of the proceedings, however, the appellate court must decide where the preponderance of the evidence lies. *Fields v. State*, 40 S.W.3d 450, 457 n. 5 (Tenn. 2001). As in all cases on appeal, "[t]he prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). We review the trial court's conclusions of law under a de novo standard without according any presumption of correctness to those conclusions. *See, e.g.*, *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999).

We are mindful of the well-settled principle that a confession must "be free and voluntary, and it must neither be extracted by any sort of threats or violence nor obtained by any direct or implied promises," nor by the exertion of any improper influence or police overreaching. *Bram v. United States*, 168 U.S. 532, 542-43 (1897). The issue of voluntariness requires the trial judge to focus on whether the accused's will to resist making a confession was overborne. *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980). When considering the voluntariness of a confession, this court must examine the totality of the circumstances surrounding the confession to determine "'whether the behavior of . . . law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" *Id.* (quoting and adopting the standard set forth in *Rogers v. Richmond*, 365 U.S. 534, 544 (1961)).

The evidence in this case does not preponderate against the trial court's findings. The defendant contacted Officer Garrett seeking advice. Early in the conversation, Officer Garrett warned the defendant that he was obliged to relay the defendant's report to law enforcement personnel. The defendant voluntarily engaged in the interview with Detectives Robinson and Cooley. During the interview, the defendant freely admitted inappropriately touching the victim on several occasions. The defendant's statement was not induced by any promises or threats. Relative to the circumstances of the controlled telephone call, any statement made by the defendant during the call only served to substantiate Officer Garrett's report to the detectives, and the substance of the statement was not admitted at trial. Accordingly, we conclude that the trial court correctly denied the motion to suppress.

*Mistrial/Limiting Instructions*

Next, the defendant contends that the trial court should have granted his request for a mistrial based upon Chief Fonseca's rebuttal testimony that the defendant had told Chief Fonseca that he had "sex with [his] daughter." The defendant argues that the State

-14-

violated discovery rules by failing to provide the statement prior to trial; that the State violated notice requirements of Tennessee Rule of Evidence 404(b); and that the State violated notice requirements of Rule 608(b). The State argues on appeal that the defendant waived his discovery and Rule 404(b) arguments by failing to cite to authority, that Rule 608(b) is inapplicable to the circumstances of this case, and that the evidence was admissible as a statement against interest.

Whether to grant a mistrial is an issue entrusted to the sound discretion of the trial court. *See State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). The burden of establishing the necessity for mistrial lies with the party seeking it. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *Id.* On appeal, this court will disturb a trial court's denial of a motion for mistrial only when there is an abuse of discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990); *Williams*, 929 S.W.2d at 388. An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)); *see also State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

At trial, the State presented Chief Fonseca's testimony without contemporaneous objection by the defendant. Likewise, the defendant made no request for a jury-out hearing pursuant to any rules of evidence. Following direct examination of Chief Fonseca, the defendant vigorously cross-examined him as well. Not until the completion of Chief Fonseca's testimony did the defendant move for a mistrial or, alternatively, a limiting instruction concerning his testimony. During the bench conference concerning the testimony, the defendant only objected to the testimony on the basis of lack of discovery via Tennessee Rule of Criminal Procedure 16.

At the motion for new trial hearing, however, the defendant argued that the evidence should have been excluded for the State's failure to comply with the notice requirements and the trial court's failure to conduct a jury-out hearing via Rules of Evidence 404(b) and 608(b). The State argued that the evidence was admissible in rebuttal to refute the defendant's claim of lack of memory and that the evidence impeached the defendant's testimony that he never admitted inappropriate conduct with the victim to any supervisor. The State also argued that any error in admitting the testimony was harmless in light of the convictions for simple assault relating to the only two incidents that occurred while the defendant claimed to be asleep. The trial court denied the defendant's motion for new trial

without discussion.

We emphasize that our focus, as directed by the defendant's framing of the issue, is upon whether the trial court erred by denying a mistrial or a limiting instruction, not whether the evidence was in itself inadmissible. Indeed, the defendant generally forfeited a claim of erroneous admission of the evidence by failing to timely object or move to strike at the time the State elicited the testimony. *See* Tenn. R. Evid. 103(a)(1) ("Error may not be predicated upon a ruling which admits evidence unless . . . a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground was not apparent from the context . . . . ").

The State was not required to disclose the substance of the defendant's statement to Chief Fonseca prior to trial because the defendant's statement to Chief Fonseca was not a statement "made before or after arrest in response to interrogation." *See* Tenn. R. Crim. P. 16(a)(1)(A). Therefore, the trial court did not abuse its discretion by denying a mistrial. We further agree with the State that any issue raised by the defendant relative to Tennessee Rule of Evidence 404(b) or Tennessee Rule of Criminal Procedure 16 has been waived for failure to cite to authority in support of his argument in his brief. *See* Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by the argument, citation to authorities, or appropriate references to the record will be treated as waived.").

As to the failure of the trial court to impart to the jury instructions for limiting the use of Chief Fonseca's testimony, the defendant requested limiting instructions based upon a violation of Rule 16 discovery. We see no rationale for limiting instructions based upon a claimed violation of discovery.[5]

---

[5] Had a timely request been grounded in Tennessee Rules of Evidence 613 and/or 404(b), limiting instructions may have been warranted. If the State in its cross-examination of the defendant "afforded him an opportunity to explain or deny" the prior statement, the rebuttal testimony might have been defensible as impeachment evidence pursuant to Rule 613. In such a situation, the opponent of the evidence is entitled to a jury instruction that the evidence may be used only for impeachment, or credibility, purposes. *See State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000); Tenn. R. Evid. 105. The defendant in the present case, however, forfeited a claim for impeachment-limiting instructions when he failed, prior to the case being submitted to the jury, to base his bid for instructions upon Rule 613. *Smith*, 24 S.W.3d at 279-80.

Also, had the State proffered the rebuttal testimony as substantive evidence of the defendant's guilt, Tennessee Rule of Evidence 404(b) could have been imposed, if not to exclude the testimony, to garner an instruction to prevent its use as propensity evidence. *See, e.g.*, *State v. Gilley*, 297 S.W.3d 739, 759-60 (Tenn. Crim. App. 2008) (considering the trial court's use of a limiting instruction in determining the relationship of the probative value of the evidence against the claim of unfair prejudice pursuant to Rule 404(b)(4)); *see State v. Leach*, 148 S.W.3d 42, 48 (Tenn. 2004) ("The trial court properly
(continued...)

*Variance*

The defendant alleges that a variance exists between the facts alleged in counts three and five of the indictment and the evidence at trial. He contends that the victim never alleged any inappropriate touching at the computer until she testified to those facts at trial. Because the computer incident, as testified to by the victim, did not include any allegation that the defendant penetrated the victim, the defendant argues that the evidence at trial did not correspond to the rape allegation in count five. The State argues that no variance occurred and that the indictment stated with sufficient specificity the acts alleged to have occurred.

A variance results when the evidence at trial does not correspond to the elements of the offense alleged in the charging instrument. *State v. Keel*, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994). In many such cases, the evidence establishes the commission of an offense different from the offense alleged in the charging instrument. *See id.* The variance rule is predicated upon the theory that an accused cannot be charged with one offense and convicted of a completely different offense. *See id.*

In the past, Tennessee has followed "a rather stringent variance rule, and if a person or thing necessary to be mentioned in an indictment is described with greater particularity than is requisite, such person or thing must be proved exactly as described in the indictment." *Bolton v. State*, 617 S.W.2d 909, 910 (Tenn. Crim. App. 1981). "The policy now followed in this and in most other jurisdictions," however, "is that before a variance will be held to be fatal it must be deemed to be material and prejudicial." *State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984). Moreover,

> [a] variance between an indictment and the proof in a criminal case is not material where the allegations and proof substantially correspond, the variance is not of a character which could have misled the defendant at trial and is not such as to deprive the accused of his right to be protected against another prosecution for the same offense.

*Id.*

---

[5](...continued)
instructed the jury that the evidence could be considered for the limited purpose [pursuant to Rule 404(b)] of determining whether it tends to show a motive."). Again, however, the defendant in the present case did not base his otherwise timely motion for a limiting instruction on Rule 404(b). As such, he waived a claim that the instruction should have been given on this basis.

In this case, the indictment contains very general allegations occurring over a broad time-frame. Count three of the indictment alleged that "between January 17, 2004 and November 1, 2005," the defendant "did intentionally engage in unlawful sexual contact with [the victim], a child thirteen (13) years of age or older but less than eighteen (18) years of age, and at the time of the offense [the defendant] had parental or custodial authority over [the victim]." Count five of the indictment alleged that within those same dates the defendant "did intentionally, knowingly, or recklessly engage in unlawful sexual penetration of [the victim], and force or coercion was used to accomplish the act." The defendant did not file any motion for bill of particulars in an attempt to narrow the allegations of each count.

At trial, the victim testified that the defendant tried to reach inside her underwear to touch her genital area while she sat on his lap at the computer. Although the victim admitted that she had not specifically disclosed this incident prior to trial, Ms. Hollands testified regarding her concern about the defendant's requiring the victim to sit on his lap to use the computer and the defendant's reaction to her concerns. The defendant admitted several instances of inappropriate touching in his statement to investigators. At the close of proof, the State elected the computer incident in support of the allegations in counts three and five. In consideration of the defendant's motion for judgments of acquittal, the trial court noted that the proof had not established an allegation of rape as to count five and granted the defendant's motion for judgment of acquittal, in part, by reducing that charge to attempted sexual battery. The allegations made via the election narrowly defined the evidence relied upon, and the defendant was not misled by the proof in any manner. *See State v. March*, 239 S.W.2d 576, 591 (Tenn. Crim. App. 2008) (holding that variance was not fatal when defendant was not misled), *perm. app. denied* (Tenn. 2009). Under the circumstances presented in this case, we conclude that the evidence in this case "substantially correspond[ed]" to the allegations in the indictment.

*Sufficiency*

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

-18-

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

Tennessee Code Annotated section 39-13-101(a)(3) defines assault as "[i]ntentionally or knowingly caus[ing] physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative." *See* T.C.A. § 39-13-101(a)(3).

Sexual battery by an authority figure is the "unlawful sexual contact with a victim by the defendant . . . [when] . . . [t]he victim was, at the time of the offense, thirteen (13) years of age or older but less than eighteen (18) years of age [and] [t]he defendant had, at the time of the offense, parental or custodial authority over the victim and used such authority to accomplish the sexual contact." *See id.* § 39-13-527(a)(1)(B). Sexual battery is the "unlawful sexual contact with a victim by the defendant . . . [when] accomplished by force or coercion." *See id.* § 39-13-505(a)(1). "'Sexual contact' includes the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that touching can be reasonably construed as being for the purpose of sexual arousal or gratification." *See id.* § 39-13-501(6). Additionally, "'[i]ntimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." *Id.* § 39-13-501(2).

"A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward commission of the offense." *See id.* § 39-12-101(a)(3).

In our view, the evidence is sufficient to support the defendant's convictions for assault, attempted sexual battery by an authority figure, and attempted sexual battery. With respect to count one, the evidence showed that the victim awoke to find the defendant lying on top of her. Although she could not remember whether the defendant fondled or attempted to fondle her because she had been asleep, the evidence clearly supports a jury's finding of "extremely offensive or provocative" physical contact. Likewise, the evidence supports the jury verdict's of assault in counts two and four based upon proof that the victim awoke to find the defendant's finger touching the inside area of her labia. The State alleged

-19-

these counts, however, as alternatives. Accordingly, the trial court should have merged them. The State also alleged alternative theories of sexual battery by an authority figure and attempted sexual battery by force or coercion in counts three and five. The proof showed that the defendant attempted to push aside the victim's underwear to attain skin-to-skin contact with her genital area while the victim sat on the defendant's lap to use the computer. We conclude that the evidence is also sufficient to support the convictions of attempted sexual battery by an authority figure and attempted sexual battery. Because these counts alleged alternative theories, however, counts three and five should have also merged.

*Limitation of Examination Concerning Sexual Offender Registry*

The defendant argues that the trial court erroneously limited his examination of witnesses concerning their feelings about the defendant's sexual offender registry supervision if convicted of the charged offenses. The trial court ruled pretrial that evidence of any witnesses' views concerning sexual offender registry supervision was irrelevant and, therefore, inadmissible. The State contends that the trial court correctly excluded such evidence because its consideration by a jury in a non-capital trial is precluded by Tennessee Code Annotation section 40-35-201(b).

The decision to admit or exclude evidence generally lies within the sound discretion of the trial court. *State v. Edison*, 9 S.W.3d 75, 77 (Tenn. 1999); *State v. Jackson*, 52 S.W.3d 661, 669 (Tenn. Crim. App. 2001); *State v. Carroll*, 36 S.W.3d 854, 867 (Tenn. Crim. App. 1999), *perm. app. denied* (Tenn. 2000). On appellate review of a trial court's decision to admit or exclude evidence on the basis of relevance, an appellate court may disturb the lower court's ruling only if there has been an abuse of discretion. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Baker*, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989).

We conclude that the trial court committed no abuse of discretion by excluding examination of witnesses regarding their views on the defendant's sexual offender registry supervision. Code section 40-35-201(b) provides "[i]n all criminal cases, except for capital crimes . . . , the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on possible penalties for the offense charged nor all lesser included offenses." The statutory provisions concerning lifetime community supervision of certain sex offenders are mandatory. *See* T.C.A. § 39-13-524 ("any person who . . . [commits or attempts to commit certain enumerated offenses] shall receive a sentence of community supervision for life").[6] Likewise, a defendant's compliance with the sexual offender registry

---

[6] Code section 39-13-524 mandates lifetime community supervision following a conviction of rape,
(continued...)

requirements following release on parole is also mandatory. *See generally id.* §40-39-102. In our view, any testimony concerning the defendant's supervision if convicted or any testimony concerning a witness's opinion regarding such supervision was irrelevant and inadmissible.

We further note that the defendant's reliance upon *Ward v. State*, 315 S.W.3d 461 (Tenn. 2010), is misplaced. In that case, our supreme court held that lifetime community supervision is a punitive consequence of a conviction of certain sexual offenses and, therefore, a defendant must be informed of the consequence of lifetime community supervision when entering a guilty plea to an applicable offense. *See Ward*, 315 S.W.3d at 474. The case in no way supports the principle that a jury must be informed of the consequences of a sexual offense conviction as urged by the defendant in this case. The trial court correctly denied questions concerning such evidence.

*Sentencing*

In his final issue, the defendant contends that the trial court erred by imposing consecutive sentences in his case and by denying him full probation. In view of the trial court's failure to merge the attempted sexual battery by an authority figure and the attempted sexual battery convictions, we agree with the State that the trial court erroneously ordered consecutive service. *See* T.C.A. § 40-35-115(b)(5) (allowing consecutive sentencing for offenders convicted of "two (2) or more statutory offenses involving the sexual abuse of a minor" under certain circumstances). We also discern no other basis to impose consecutive sentences in this case. *See id.* That being said, on remand the trial court shall enter judgments reflecting merger of counts two and four and counts three and five with the imposition of concurrent sentences in counts one, two, and three. The defendant does not challenge the length of the sentences imposed by the trial court. Accordingly, following remand, the total effective length of sentence imposed is now two years.

The defendant also claims that the trial court should have granted him full probation. The trial court sentenced the defendant to a term of probation in counts two through five. The trial court sentenced the defendant to a six month period of incarceration only in count one based upon its finding that some period of incarceration was necessary to avoid depreciating the seriousness of the offenses. The State argues that the trial court

---

[6](...continued)
aggravated rape, aggravated sexual battery, and child rape. Thus, lifetime supervision was potentially applicable only to the defendant's rape charges. That being said, the defendant's conviction of attempted sexual battery by an authority figure will require compliance with sexual offender registry requirements upon the completion of his sentence. *See* T.C.A. § 40-39-102(5)(A)(xviii).

correctly denied full probation and urges this court to affirm a sentence of split confinement consisting of six months' incarceration followed by probation for the remaining portion of the two-year sentence.

When considering challenges to the length and manner of service of a sentence this court conducts a de novo review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d)(2006). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The appealing party, in this case the defendant, bears the burden of establishing impropriety in the sentence. T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also Ashby*, 823 S.W.2d at 169. If our review of the sentence establishes that the trial court gave "due consideration and proper weight to the factors and principles which are relevant to sentencing under the Act, and that the trial court's findings of fact . . . are adequately supported in the record, then we may not disturb the sentence even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In making its sentencing decision, the trial court was required to consider:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The trial court should also consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5).

Because, in this instance, the sentence imposed is ten years or less, the trial court was required to consider probation as a sentencing option. *See* T.C.A. § 40-35-303(a), (b). Nevertheless, the defendant bears the burden of establishing his "suitability for full

probation." *State v. Mounger*, 7 S.W.3d 70, 78 (Tenn. Crim. App. 1999); *see* T.C.A. § 40-35-303(b); *State v. Bingham*, 910 S.W.2d 448, 455-56 (Tenn. Crim. App. 1995), *overruled in part on other grounds by Hooper*, 29 S.W.3d at 9-10. In consequence, the defendant must show that probation will "subserve the ends of justice and the best interest[s] of both the public and the defendant." *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990) (quoting *Hooper v. State*, 297 S.W.2d 78, 81 (1956)), *overruled on other grounds by Hooper*, 29 S.W.3d at 9-10.

Among the factors applicable to probation consideration are the circumstances of the offense; the defendant's criminal record, social history, and present condition; the deterrent effect upon the defendant; and the best interests of the defendant and the public. *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978). The trial court denied the defendant's request for full probation based upon its finding that "some confinement is necessary to avoid depreciating the seriousness of the offense, and to act as a deterrent to others." We conclude that the record supports the trial court's denial of full probation.

*Conclusion*

The trial court correctly denied the defendant's motion to suppress, motion for mistrial, and motion for judgments of acquittal based upon variance. The trial court properly excluded testimony concerning witnesses' views regarding the sexual offender registry requirements. The evidence is sufficient to support the convictions. The trial court correctly denied full probation in this case. The trial court did err, however, by ordering consecutive sentences and by failing to merge counts two and four and counts three and five. Accordingly, on remand, the trial court shall enter judgments reflecting merger of these counts and the imposition of concurrent sentences in the remaining counts (one, two, and three). In all other respects, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE